**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| GENESIS HEALTHVENTURES OF NAUGATUCK, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civ. No. 04-1766 (LFO) |
| MICHAEL O. LEAVITT, | ) ) ) | |
| Defendant | ) ) | |

## MEMORANDUM & OPINION

Plaintiff Genesis Health Ventures of Naugatuck, Inc. owns 219 skilled nursing facilities that provide services to Medicare patients; each of these facilities is also a plaintiff.[1] Plaintiffs brought this action against the Secretary of Health and Human Services seeking reversal of a final decision of the Provider Reimbursement Review Board ("Board") requiring Plaintiffs to allocate employer contributions of Federal Insurance Contributions Act (FICA) taxes to the Employee Health and Welfare cost center ("Employee Health and Welfare") for fiscal years 1996, 1997, and 1998. Plaintiffs had sought to allocate FICA contributions to the Administrative and General cost center ("Administrative and General"), which would have increased their Medicare reimbursement for those cost years by approximately eight million dollars. For the reasons stated herein, an accompanying order grants the Secretary's motion for summary judgment and denies Plaintiffs' motion for summary judgment.

---

[1] On July 27, 2007, the Calendar Committee reassigned this case from the late Judge John Garrett Penn to Judge Louis F. Oberdorfer [Dkt. No. 21].

**I. Background**

Plaintiffs have entered into a "provider agreement" with the Secretary to provide Part A Medicare services. *See* 42 U.S.C. §§ 1395x(u), 1395cc. A private insurance company, BlueCross BlueShield Association/Veritus Medicare Services (the "Intermediary"), acts as the Secretary's agent to review Plaintiffs' claims for reimbursement and to administer payment. *See* 42 U.S.C. §§ 1395h, 1395x(u). Plaintiffs receive interim payments throughout the fiscal year. *See* 42 U.S.C. § 1395g. Within five months after the close of each fiscal year, Plaintiffs must file Medicare cost reports with the Intermediary. *See* 42 C.F.R. §§ 413.20(a), 413.24(a), (f) (2001). The Intermediary reviews the cost report and determines the amount of Medicare reimbursement due Plaintiffs for that fiscal year, offset by interim payments. *See* 42 C.F.R. § 405.1803 (2001).

During the period at issue, Medicare reimbursed Plaintiffs for reasonable costs "determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs." 42 U.S.C. § 1395f(b)(1). The regulations establishing the guidelines for determining "reasonable cost" are published in 42 C.F.R. Part 413 (2001). The Provider Reimbursement Manual ("the Manual" or "PRM") contains the Secretary's interpretations of the governing statute and regulations to assist agency decision makers and facilities in understanding how to apply the reasonable cost rules.

The first step in determining a facility's reimbursement is to identify the "allowable" costs of furnishing covered services. 42 C.F.R. § 413.24(d) (2001); *see also* 42 C.F.R. 413.50(a) (2001). Allowable costs are "necessary and proper expenses of an institution in the production of services," 42 C.F.R. § 413.5(a) (2001), "which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 C.F.R. § 413.9(b) (2001). After allocating each allowable cost to an appropriate cost center, PRM § 2302.7, the provider

apportions them between Medicare and non-Medicare patients so that the program reimburses the provider for only those costs incurred treating Medicare beneficiaries. *See* 42 C.F.R. Pt 413, Subpt. D. (2001)

Cost centers can generally be classified as either (1) revenue producing cost centers, which produce patient care revenue, and (2) non-revenue producing cost centers, which do not directly generate patient care revenue but contribute to patient care revenue by serving the revenue producing cost centers. PRM § 2306. In order to properly match revenue and expenses, the regulations provide that the costs of revenue-producing cost centers should include both their direct expenses as well as their proportional share of each non-revenue producing cost center based on the amount of services received. 42 C.F.R. § 413.24 (2001). The regulations characterize this as "cost finding" and define it as "the determination of [the costs of the various types of services furnished] by the allocation of direct costs and proration of indirect costs." 42 C.F.R. § 413.24(b) (2001).

Plaintiffs used the "step-down" method to allocate allowable costs to the appropriate cost centers:

> Step-down Method. This method recognizes that services furnished by certain nonrevenue-producing departments or centers are utilized by certain other nonrevenue-producing centers as well as by the revenue-producing centers. All costs of nonrevenue-producing centers are allocated to all centers that they serve, regardless of whether or not these centers produce revenue. The cost of the nonrevenue-producing center serving the greatest number of other centers, while receiving benefits from the least number of centers, is apportioned first. Following the apportionment of the cost of the nonrevenue-producing center, that center will be considered "closed" and no further costs are apportioned to that center. This applies even though it may have received some service from a center whose cost is apportioned later. Generally, if two centers furnish services to an equal number of centers while receiving benefits from an equal number, that center which has the greatest amount of expense should be allocated first.

42 C.F.R. § 413.24(d)(1) (2001). Similarly, the Manual defines "general service cost centers" as "organizational units which are operated for the benefit of the institution as a whole," PRM §

3

2302.9, and directs providers to allocate general service costs to other cost centers using the step-down process:

> The costs of a general service cost center need to be allocated to the cost centers receiving service from that cost center. This allocation process is usually made, for Medicare cost reporting purposes, through cost finding using a statistical basis that measures the benefit received by each cost center.

PRM § 2307.

### A.     Letters Discussing FICA Allocation

A series of letters from the Health Care Financing Administration (the "Administration")[2] in 1998 and early 1999 (the "1998 Letters") addresses the allocation of FICA costs. On April 14, 1998, one of the Administration's intermediaries wrote to the Administration's Division of Cost Reporting and "requested clarification concerning the proper classification of workers' compensation and employment related taxes as employee benefits or administrative costs on the Medicare cost report." AR 547. On May 5, 1998, the Administration responded in writing:

> Workers' compensation and other employment related taxes (employer's share of FICA, unemployment compensation) are not fringe (employee) benefits; rather, they are administrative business costs of the provider. Accordingly, these costs are generally included in the provider's administrative and general cost center.

*Id*. The letter went on to note that these costs "may, dependent upon the individual provider's accounting sophistication and subject to intermediary approval, be allocated directly to the various cost centers to which related employee compensation costs have been allocated." *Id*.

In July 1998, in response to a request for further clarification, the Administration sent another letter (the "July 1998 Letter") that stated:

---

[2] The Administration changed its name to the Centers for Medicare and Medicaid Services sometime after the period relevant to this case.

>Payroll-related taxes such as workers compensation, unemployment compensation and F.I.C.A. (employer's share) are not considered fringe benefits because they are not amounts paid to, or on behalf of, an employee in addition to direct salary or wages (see PRM section 2144.1). Rather, these costs are considered payroll-related tax costs.

AR 551-52. The letter stated that allocating payroll-related taxes to cost centers that have incurred payroll costs is "preferred over a method that would allocate these costs through the A&G cost center" *Id*. The letter went on to state that providers that lack a level of accounting sophistication sufficient to break out payroll-related taxes and place them in the cost centers that have incurred payroll costs "may include these costs in the A&G cost center for allocation purposes" and that the Administration has "no plans to limit the flexibility that providers have in reporting these costs." *Id*.

In a letter dated April 8, 1999 to a Medicare appeals consultant, the Administration stated that "Payroll related tax costs for workers compensation, FICA (Employer's portion), FUTA and SUTA should be recorded as administrative and general (A&G) costs" but that "the provider may, subject to intermediary review and approval, directly allocate the costs to the various cost centers to which related salary costs had been allocated." Letter from Ward C. Pleines to Paul R. Gulbrandson dated April 8, 1999 (AR 554).

**B.     Plaintiffs' Cost Reports**

Plaintiffs completed cost reports for fiscal years 1996 and 1997 and filed them with the Intermediary, assigning the FICA costs to Employee Health and Welfare, before they learned of the 1998 Letters. At the hearing before the Board, Plaintiffs' Vice President of Reimbursement testified that he assigned these costs to Employee Health and Welfare because, "It was the way, when I first started doing cost reports many years prior, I had always been told to do it, and I did it that way as a matter of course." Board Hearing Tr. (Sept. 12, 2003) at 64-65, AR 80.

Plaintiffs learned of the 1998 Letters in May 1999, just before the June 1 due date for the 1998 cost reports. *Id*. Plaintiffs requested a two-week extension to allow them to adjust the 1998 cost report to allocate FICA to Administrative and General. *Id*. The Intermediary responded that, should Plaintiffs not file their cost reports by their due date, it was "extremely likely" that the Intermediary would suspend Medicare payments to Plaintiffs. AR Supp. 18. In light of this response, Plaintiffs indicated that they would submit their 1998 cost reports by June 1, 1999 and "employ the traditional methodology [they have] used for allocating [their] cost for cost report filing purposes." *Id*. Plaintiffs' original 1998 cost report allocated FICA to Employee Health and Welfare. Plaintiffs filed amended 1998 cost reports allocating FICA to Administrative and General, but the Intermediary refused to accept them. *See* AR Supp. 20. The Intermediary also denied Plaintiffs' request to reopen its 1996 and 1997 cost reports to allow it to reclassify payroll-related costs. AR Supp. 22.

The Intermediary computed the reimbursement amounts due Plaintiffs by allocating all payroll-related tax costs, including employer FICA contributions, to Employee Health and Welfare. As a result, Plaintiffs received approximately eight million dollars less in reimbursement payments than they would have received if their employer FICA contributions had instead been allocated to Administrative and General. AR 4-5. On August 6, 1999, Genesis noticed a timely group appeal to the Board challenging the Intermediary's treatment of payroll-related tax. AR Supp. 413-17.

On August 23, 1999, the Administration sent its intermediaries a letter ("August 1999 Letter") which begins by stating that the most accurate and appropriate method of cost finding is to assign payroll-related tax costs "to those cost centers charged with the related salary costs" rather than assigning them to Administrative and General. AR 162-63. The letter stated:

6

>   In my prior letter, I also should have pointed out that the current cost reporting
>   instructions provide that payroll-related tax costs may be reclassified to the
>   employee benefits cost center to be allocated on the basis of gross salaries (see the
>   Provider Reimbursement Manual, Part 2 (HCFA Pub. 15-II)(PRM), section
>   3611).  In terms of the degree of appropriateness and accuracy, this method would
>   rank second (i.e., slightly less accurate than directly assigning the payroll-related
>   costs, but clearly more accurate than allocating these costs as a component of
>   A&G).

AR 163.  The letter continues:

>   I understand that some providers have requested and received your approval to
>   change their allocation bases from a more accurate option to a less accurate option
>   (e.g., from direct allocation to A&G or from employee benefits to A&G). Any
>   further requests of that nature should not be approved. Moreover, any previously
>   granted requests should be rescinded. The regulations at 42 CFR 413.24 and PRM
>   at chapter 23 prohibit the use of a less appropriate and accurate cost allocation
>   once the provider has used a more appropriate and more accurate cost allocation.

*Id.*

## C.    Proceedings Before the Board

The Board originally denied jurisdiction over the appeal, and Plaintiffs appealed that decision to this court.  AR 518-25.  After the parties filed a stipulation of settlement, the court ordered the Board to decide the appeal on the merits.  AR 274.  On September 12, 2003, the Board conducted a hearing on the record on the question "Should the Providers' Federal Insurance Contributions Act (FICA) payroll costs be classified to the administrative and general cost center?"  AR 4, 65-123.

Plaintiffs made substantially all the arguments they make here:  that the 1998 Letters were binding on the Intermediary; that FICA taxes are not properly allocated to Employee Health and Welfare because they are not a fringe benefit; that there is not a prohibited cost shift by allocating payroll-related tax costs to Administrative and General; and that other providers may have been granted permission to classify payroll-related tax costs as Administrative and General. *See* AR 3-8

7

The Board, in a unanimous opinion dated August 13, 2004, rejected each of plaintiffs' arguments in turn. *Id.* First, the Board found that

> the primary consideration in this case is the payment of reasonable costs consistent with the regulation at 42 C.F.R. § 413.24, which seeks the development and application of methodologies which yield the most accurate determination of actual costs incurred in the provision of health care services under the Medicare program. The Board finds that the Intermediary's methodology for allocating FICA costs is the most accurate and appropriate.

AR 8. The Board reasoned that since FICA costs are salary-generated costs, "the use of gross salaries as the allocation basis" is the most accurate way to allocate these costs because it links the costs to those activities that benefit "from the services rendered by employees." AR 7. The Board found that Plaintiffs' FICA costs fit within the definition of a "fringe benefit" and, as such, "should be classified to the employee benefits cost center." AR 7. The Board found that "[u]sing the allocation method advanced by Providers would result in the allocation of costs to cost centers that do not even contain any employees or direct salary expense." AR 8. The Board also found that the fiscal intermediary "has demonstrated that the Providers' allocation approach over-allocates costs to ancillary departments that are reimbursed at a higher Medicare utilization rate." AR 8.

The Board stated that "[w]hile [Administration] letters can be accorded 'great weight' by the Board, the letters in the instant case reflect inconsistent points of view" and, therefore, the letters taken as a whole were unpersuasive and not entitled to any "particular deference." AR 8. (quoting 42 C.F.R. § 405.1867 (2001) ("The Board shall afford great weight to interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS.")).

Accordingly, the Board ruled that the fiscal intermediary's decision to allocate Plaintiffs' FICA taxes to the Employee Health and Welfare cost center "is proper and is affirmed." AR 8.

8

**D.     Procedural History**

On October 1, 2004, the Administration declined to further review the Board's decision. AR 2. Plaintiff filed this action pursuant to 42 U.S.C. § 1395oo(f)(1), which provides for judicial review of final agency decisions on Medicare provider reimbursement disputes under the terms of the Administrative Procedure Act, 5 U.S.C. §§ 701-06. Each party moved for summary judgment. Plaintiffs raise four arguments: (1) the Board retroactively applied an interpretive rule; (2) allocating employer FICA contributions to Administration and General would not result in improper cost shifting; (3) employer FICA contributions are not fringe benefits; and (4) the Secretary has treated Plaintiffs differently from similarly situated service providers.

## II. Discussion

**A.     Standard of Review**

A court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-15 (1971). Under the arbitrary and capricious standard, a court may invalidate an agency action only if it is "not rational and based on consideration of the relevant factors." *F.C.C. v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 803 (1978). The substantial evidence standard is satisfied if the final agency decision is supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (quoting *Consolidated Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). This court reviews the agency decision on the administrative record without considering matters outside the record. *Walter O. Boswell Mem. Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

**B.      Retroactive Application of Interpretive Rule**

"[T]he Secretary has no authority to promulgate retroactive cost-limit rules." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 215 (1988). "[I]nterpretive rules, no less than legislative rules, are subject to *Georgetown Hospital*'s ban on retroactivity." *Health Ins. Ass'n of America, Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994). Plaintiffs argue that the Board was required to act as if the August 1999 Letter (instructing Intermediaries to allocate FICA contributions to Employee Health and Welfare) did not exist because it was an interpretive rule issued after Plaintiffs filed their request to reopen the cost reports. Had the Board done so, Plaintiffs argue, it would have given the 1998 Letters the "great weight" required by 42 C.F.R. § 405.1867 and ruled in favor of Plaintiffs' request to allocate employer FICA contributions to Administrative and General.[3]

The flaw in Plaintiffs' reasoning is that, even if the August 1999 Letter does promulgate an interpretive rule, the Board relied on the letter merely as evidence that the 1998 Letters did not accurately state the rule in effect at that time. The August 1999 Letter states that it was written to "clarify" the July 1998 Letter. AR 162. It further states, "In my prior letter, I also should have pointed out that the *current cost reporting instructions* provide that payroll-related tax costs" should be allocated to Employee Health and Welfare, and that this method is "clearly more accurate" than allocating such costs to Administrative and General. *Id.* (emphasis added). The letter then instructs the Intermediary not to approve any requests by providers to "change their allocation bases from a more accurate option to a less accurate option (e.g., from direct

---

[3] If this court were to find that the Board failed to properly weigh the letters, the remedy would be remand, not reversal. *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 365-66 (D.C. Cir. 1995) ("[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards.").

allocation to [Administrative and General] or from employee benefits to [Administrative and General])." *Id.*  Thus, the August 1999 Letter contains an admission that the July 1998 Letter did not accurately state the rule in effect at that time.  An admission of such an error by the author calls into question the reliability of the June 1998 Letter and the other 1998 Letters that reach the same conclusion.  It was not error for the Board to rely on this admission in declining to give great weight to the 1998 Letters.

Moreover, at the time Plaintiffs incurred the costs at issue here, they themselves believed the rule to be as described in the August 1999 letter.  As one of Plaintiffs' employees testified at the hearing before the Board, allocating FICA contributions to Employee Health and Welfare "was the way, when I first started doing cost reports many years prior, I had always been told to do it, and I did it that way as a matter of course."  AR 80.  The law disfavors retroactivity because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."  *Cookeville Reg'l Med. Ctr. v. Leavitt*, No. 07-5252 (D.C. Cir. June 27, 2008) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 255, 265 (1994)) (discussing exceptions to the presumption against retroactivity in statutory construction).  Because the August 1999 Letter conformed with Plaintiffs' settled expectations during the 1996, 1997, and 1998 cost years, the elementary considerations of fairness are satisfied here.

**C.     Cost Shifting**

The Secretary argues that the allocation method that the Board upheld – the use of gross-salaries as the allocation basis for salary-generated costs – is the most accurate way to apportion costs between Medicare and non-Medicare patients and that this is the most important consideration.  The Board's reasoning makes intuitive sense, and at least one court has upheld

11

this reasoning. *See Pleasant Care Corp. v. Leavitt*, No. 05-05456 (C.D. Cal. Aug. 2, 2006) (upholding a Board decision denying a provider's request to reopen cost reports to change its allocation of FICA to the Administrative and General cost center because the Board's holding that such an allocation was less accurate was supported by substantial evidence).

Plaintiffs have not attempted to show that their preferred allocation method is more accurate. Rather, Plaintiffs argue that case law requires the Secretary to make a finding that classifying FICA costs as Administrative and General would cause a disproportionate allocation of Administrative and General costs as a whole, citing for that proposition *Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984). That case is easily distinguished from the current dispute. The Secretary's decision at issue in *Walter O. Boswell* modified an existing cost allocation scheme to remove medical malpractice premiums from the administrative and general cost center. The Secretary justified this change as follows:

> We believe that the current cost finding and apportionment procedure is generally an equitable method of allocating [non-malpractice] overhead costs. However, because malpractice costs are so significant and the disproportionate allocation of malpractice costs to Medicare is so great, we believe a unique exception is warranted to deal with these costs.

*Id.* at 794. The D.C. Circuit noted that the "precise factual basis for this conclusion, however, remains obscure from the record before the District Court." *Id.* The court stated that, to justify his decision, the Secretary must make a finding that failing to remove malpractice premiums from the administrative and general cost center results in improper cost shifting when the cost center is taken as a whole. *Id.* at 795.

So far, this decision does seem to support Plaintiffs' argument, because there is no record that the Secretary made such a finding in the case now before the court. However, the *Walter O. Boswell* court went on to say that this requirement to examine the costs taken as a whole exists because the old method "had long been presumed to balance costs fairly between Medicare and

non-Medicare patients." *Id.*  This supports the Secretary's position, because the Secretary is advocating maintaining a long-standing rule – one followed by Plaintiffs for "many years" "as a matter of course."  AR 80.  As such, there is a presumption that this rule – the rule upheld by the Board – balances costs fairly.

Plaintiffs also rely on *National Medical Enterprises, Inc. v. Shalala*, 43 F.3d 691 (D.C. Cir. 1995) as an example of the D.C. Circuit affirming "the reversal of a [Board] decision where the Board had done precisely what it did here: require that a particular cost be classified in the manner it believed to be the most accurate methodology for allocating the particular cost despite the absence of any evidence showing that that reporting methodology was required to avoid disproportionate allocation of an entire category of costs taken as a whole."  Pl. Motion for Summary Judgment at 36.

Plaintiffs are misapplying *National Medical Enterprises*.  The D.C. Circuit upheld the Secretary's decision to overrule the Board in that case, deferring to the Secretary's decision to use an "allegedly" less accurate allocation method because "the Secretary has resolved this difficult task [of allocating costs] by adopting an averaging system wherein costs are balanced between Medicare and non-Medicare patients as a whole and not on a per service basis."  *Nat'l Med. Enters.*, 43 F.3d at 696.  Nothing in the opinion justifies requiring the Secretary to use a less accurate allocation method for a particular cost.

Plaintiffs have presented no argument that their desired method of cost allocation is more accurate than the Secretary's long-standing method.  Moreover, the requirement that changes to cost allocation methods be justified by analysis of costs as a whole supports the Secretary's contention that the 1998 Letters do not represent a considered change in policy, because there is no evidence that those letters were based on such a comprehensive analysis.

Case law requires the Secretary to perform an analysis of any change in cost allocation method that takes into account the costs as a whole. However, there is no case law that requires the Secretary to do so when he is not making a change in the method of cost allocation. There is substantial evidence to support the Board's decision that allocating FICA to the administrative and general cost center is less accurate than the method used by Plaintiffs in their original cost reports.

**D.     Categorization as Fringe Benefit**

The Board found that employer FICA contributions are fringe benefits and thus properly categorized as Employee Health and Welfare costs. Plaintiffs raise two objections: (1) the Board should have given great weight to the 1998 Letters' statements that employer contributions to FICA are not a fringe benefit; and (2) case law supports the contention that employer contributions to FICA are not a fringe benefit. The first argument is addressed and disposed of above.

As for their second argument, Plaintiffs first cite two bankruptcy cases which found that workers' compensation insurance premiums are not fringe benefits. The Medicare program has its own definition of fringe benefits:

> Fringe benefits are amounts paid to, or on behalf of, an employee, in addition to direct salary or wages, and from which the employee, his/her dependent (as defined by IRS), or his/her beneficiary derives a personal benefit before or after the employee's retirement or death. In order to be allowable, such amounts must be properly classified on the Medicare cost report, i.e., included in the costs of the cost center(s) in which the employee renders services to which the fringe benefit relates and, when applicable, have been reported to the IRS for tax purposes. . . .

*See* AR 7 (quoting HCFA Pub. 15-1 § 2144.1). Because the aspects of this definition that the Board decision relies on were not relevant to the cited bankruptcy cases, they are inapplicable here.

Plaintiffs also cite a holding by the Board that workers' compensation costs are not fringe benefits and are properly allocated to Administrative and General.  *Longwood Mgmnt Corp. Group v. Blue Cross and Blue Shield Ass'n, Blue Cross of California*, PRRB Decision 99-D34, Case No. 97-0354G (April 06, 1999).  The Board cited a bankruptcy decision that distinguished workers' compensation costs from fringe benefits because workers' compensation insurance primarily benefits the employer by covering a state-imposed liability.  The Board also contrasted the Manual's statement that "workers' compensation insurance [is] a form of liability insurance . . . primarily purchased to protect the employer (Providers) against potential losses due to workers injury" with the rule that "fringe benefit[s] inure primarily to the benefit of the employee."  *Id*.  The Board in *Longwood* found the definition of liability insurance "more compelling" as applied to workers' compensation because "it specifically addresses the type of insurance (liability) which workers compensation encompasses."  *Id*.

The reasoning in *Longwood* is not applicable here.  It is clear that employer FICA contributions do not qualify as liability insurance.  Therefore, the Board could not have applied *Longwood*'s reasoning in this case.  Plaintiffs point out that the Board in *Longwood* did note that "fringe benefits are generally 'bargained for' between employers and employees."  *Id*.  Employer FICA contributions are not bargained for, they are mandated by law.  However, *Longwood* did not say that all fringe benefits are bargained for, it said they were "generally" bargained for.  Therefore, the Board's decision in this case is consistent with *Longwood*.  The Board's finding that "the employer's share of FICA taxes is an employee fringe benefit that serves to secure a right to a future benefit, i.e., social security at retirement, disability or survivor's benefits" is consistent with the Medicare program's definition of fringe benefits and is thus supported by substantial evidence.

### E. Disparate Treatment

Plaintiffs argue that the Secretary has treated them differently from similarly situated service providers. The burden is on "an appellant complaining of inconsistency and capriciousness in the agency's explanation of its treatment to bring before the reviewing court sufficient particulars of how the appellant was situated, how the allegedly favored party was situated, and how such similarities as may exist dictate similar treatment and how such dissimilarities as may exist are irrelevant or outweighed." *PIA Michigan City Inc. v. Thompson*, 292 F.3d 820, 826 (D.C. Cir. 2002). Plaintiffs cite three pieces of evidence in their attempt to meet this burden: (1) the August 1999 Letter, (2) the Intermediary's testimony before the Board, and (3) transcript evidence from a similar case before the Board. None of this evidence provides the proof necessary to sustain Plaintiff's claim of disparate treatment.

<u>August 1999 Letter</u>. Plaintiffs rely on the following excerpt from the August 1999 Letter as evidence that other providers received the treatment Plaintiffs seek:

> I understand that some providers have requested and received your approval to change their allocation bases from a more accurate option to a less accurate option (e.g., from direct allocation to A&G or from employee benefits to A&G). Any further requests of that nature should not be approved. Moreover, any previously granted requests should be rescinded.

AR at 162. The letter writer's "understanding" is insufficient to prove that other providers received disparate treatment. Further, the letter actually indicates that intermediaries should deny providers' requests to allocate employer FICA contributions to Administrative and General – in other words, that providers should receive the same treatment as Plaintiffs.

<u>Intermediary's Testimony</u>. Plaintiffs argue that testimony of the Intermediary's representative at the hearing before the Board is evidence that some intermediaries allowed other providers to allocate FICA contributions to Administrative and General. Pl. Reply at 14-15. A

reading of the entire transcript passage makes it clear that the Intermediary was not aware of any providers that were allowed to reclassify their FICA costs:

> Q . . . before you came here today, were you aware that the Intermediary that you work for had both received and approved the very type of cost reclassification change that Genesis is seeking here prior to August 23, 1999?
>
> A. For FICA?
>
> Q. For Providers other than Genesis?
>
> A. No, I wasn't. No, I was not.

AR at 115.  After questioning the witness about his understanding of the August 1999 Letter, Plaintiffs' counsel then asked, "are you aware of any basis for [the Intermediary] to have approved such a change other than the [1998] letters?"  The witness answered, "No." *Id*.  The witness did agree that the letters seem to indicate that some providers sought and approved a reclassification of FICA to general and administrative costs, but he never provided any indication that he has independent knowledge of that occurring.  His testimony on this issue amounts at most to a restating of the August 1999 Letter.

      <u>Testimony Before Board in Similar Case</u>.  Plaintiffs ask the court to take judicial notice of testimony before the Board in a similar case, *Mutual of Omaha v. Pleasant Care Corp.*, Case No. 00-0909G.  There, a managerial employee of the intermediary testified that he allowed several providers to reopen cost reports to change the allocation of employer FICA contributions to Administrative and General.  The intermediary did not require these providers to reclassify FICA after issuance of the August 1999 Letter:

> Q: Why didn't you reopen the cost reports, the 14 that you reopened [and allowed reclassification on], why didn't you reopen them and reverse the adjustment?
>
> A: Well, what we had done is, at least in my view, there were no precise program instructions on that.  We got the [April 1999 Letter].  I considered that statement of policy at the time.  When I called Ward, [the author of the letter] what he told me was that HICFA [sic] had reconsidered their position.  At some point in time,

17

> HICFA's [sic] position is changing, so I didn't see the reason to go back and reopen and take the money away from the Providers. I mean, I think that we did our best to determine what HICFA [sic] policy was at that time, and we paid the providers. So I wasn't going to take it back.

Pl. Opp. to Def. Mot. for Sum. J., Ex. 2, *Mutual of Omaha* Tr. at 135:13-136-9.

In contrast to this evidence that a single intermediary allowed an unspecified number of providers to do the same thing Plaintiffs seek to do here – reopen cost reports to reallocate employer FICA contributions to Administrative and General – there are examples of providers receiving the same treatment as Plaintiffs. In the *Mutual of Omaha* case, the Board ruled, just as it did in this case, that employer FICA contributions are properly allocated to Employee Health and Welfare. *Mutual of Omaha v. Pleasant Care Corp.*, PRRB Decision 2005-D43, Case No. 00-0909G, June 10, 2005.[4] The testimony given above makes it clear that, after receiving the August 1999 Letter, the intermediary did not allow providers to reopen cost reports to change their FICA allocation.

Although examples of similar treatment are not in and of themselves a defense to claims of disparate treatment, these examples serve to illustrate that the brief period in which a single intermediary allowed some providers to reopen cost reports was an erroneous departure from long-standing policy. Plaintiffs have provided a single instance where the Secretary failed to reclaim money improperly paid to some providers. The prohibition against disparate treatment does not require repeating that error for Plaintiffs' benefit.

### III. Conclusion

The Board's decision is supported by substantial evidence. Plaintiffs do not even attempt to argue that the Board's central holding – that categorizing employer FICA contributions as

---

[4] A district court upheld the Board's decision. *See Pleasant Care Corp. v. Leavitt*, No. 05-05456, (C.D. Cal. Aug. 2, 2006).

fringe benefits and allocating them to the Employee Health and Welfare cost center is more accurate than allocating those costs to Administrative and General – is incorrect.  Nor are their arguments that the Board improperly applied a retroactive interpretive rule or treated Plaintiffs differently than other similarly situated providers persuasive.  Therefore, an accompanying order will grant the Secretary's motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: June 30, 2008                                        Louis F. Oberdorfer
                                                                              United States District Judge